**SO ORDERED.**

**SIGNED this 29th day of April, 2016.**



_____
Robert E. Nugent
United States Chief Bankruptcy Judge

DESIGNATED FOR ONLINE PUBLICATION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE: | |
| RONALD L. KRIER | Case No. 14-12439 |
| | Chapter 12 |
| **Debtor.** | |

## ORDER DENYING CONFIRMATION

Ronald Krier's chapter 12 plan treats his domestic court obligation to his former wife, Constance Schaffer, as an allowed secured claim rather than as a "domestic support obligation" that must be repaid before his plan can be confirmed. He offers to repay the debt over 20 years, extending what was originally a fifteen year obligation in 2005 to one that might not be paid in full until 2036. In a May 2014 settlement agreement, Schaffer agreed to reduce her debt from $106,000 to $88,000

1

that was payable in full on November 1, 2014. That agreement was a novation that replaced the parties' original 2005 property settlement. The 2014 agreement didn't delineate between property settlement and maintenance like the 2005 agreement did, stripping the debt of its domestic support obligation character and excusing Krier from having to pay it in full as a prerequisite to confirmation.[1]

Krier's obligation to Schaffer under the 2014 agreement is instead a fully secured claim that may be paid by a stream of payments equal in value to the allowed amount of the claim. But Schaffer is not a bank. She is a former spouse who has already waited 11 years to receive payment for her share of the marital estate—an estate that Krier has continued to use while not paying his obligations to her. Converting Schaffer's claim from a single payment obligation due in a few weeks to a 20 year loan lacks good faith under § 1225(a)(3) and falls short of the secured claim requirements of § 1225(a)(5). Since the plan doesn't comply with § 1225, confirmation must be DENIED. The debtor is granted 21 days from the date of this order to file an amended plan or to convert to chapter 7. Otherwise, the case will be dismissed.[2]

Facts

---

[1] *See* 11 U.S.C. § 101(14A); *In re Taylor*, 737 F.3d 670, 676 (10th Cir. 2013); and *In re Sampson*, 997 F.2d 717 (10th Cir. 1993); see also § 1225(a)(7) (Requiring that all domestic support obligations becoming due and payable after filing be paid in full).

[2] Confirmation of debtor's chapter 12 plan was submitted to the Court on Krier's and Schaffer's joint stipulation of facts and briefs. *See* Dkt. 65 and supporting exhibits thereto. The debtor Ronald L. Krier appears by his attorney Dan Forker. Creditor Constance Schaffer appears by her attorney Kelsey N. Frobisher.

2

Constance Schaffer and Ronald Krier separated in 2004 after a 15 year marriage and were divorced in 2005. In their Property Settlement Agreement (the "2005 Agreement"), Krier agreed to pay Schaffer $63,750 in property settlement and the same amount in "spousal maintenance."[3] The property and maintenance payments were due every February and August in equal amounts and were to be paid in full within fifteen years, not later than February of 2020. If the debtor missed a property settlement payment, interest would accrue on any unpaid balance. If Schaffer married or died during the repayment period, Krier's obligation to pay the maintenance portion of the debt would terminate. The agreement recited that none of the obligations were dischargeable in bankruptcy. The District Court of Osborne County made this agreement a part of the divorce decree it issued on May 18, 2005.[4]

Krier missed many payments. In 2013, Schaffer requested and received an order from the state court determining that Krier was $24,013 behind on maintenance and $24,013 behind on the property settlement. The parties stipulate that, before they signed the 2014 Settlement Agreement, Krier owed Schaffer over $106,000.[5]

In 2010 and 2012, Krier granted his lender, Guaranty State Bank & Trust Co. mortgages on his farmland. Those mortgages are subordinate in priority to Schaffer's judgment lien. When Krier defaulted in 2013, the Bank foreclosed, including Schaffer

---

[3] Dkt. 65-2.
[4] Dkt. 65-1.
[5] Dkt. 65-4.

3

and other judgment lien creditors as party defendants.[6] That foreclosure led to a mediated global settlement that is documented by a May 2014 Settlement Agreement (the "Settlement Agreement") between Krier and all of his secured creditors.[7]

In the Settlement Agreement, the parties "agree and acknowledge" that the Krier-Schaffer divorce decree "created certain obligations between [them] concerning payment of spousal support (sometimes referred to as alimony or spousal maintenance, and payment of monies to equalize a property division."[8] After reciting the other debts Krier owed the plaintiff and defendants, the Settlement Agreement provides:

> The parties agree and acknowledge that they are entering into this agreement to establish certain amounts to be paid by Krier to all of the parties, the priority for payment, and ***to resolve all issues pending before the parties in all cases set forth above***, together with any other issues not heretofore stated or alleged by the parties.[9]

The Settlement Agreement then recites that Schaffer will be paid $88,000 and elaborates:

> Krier and Schaffer agree that the above amount differs from the agreement of the parties concerning payment of monies by Krier to Schaffer in said divorce action, and that both parties agree to a modification of said amount, the terms and conditions of payment, and that upon the payment of $88,000 to Schaffer as set forth above, all obligations of Krier to Schaffer for payment as previously agreed to by the parties will be deemed satisfied and paid in full.[10]

---

[6] Dkt. 65-6.
[7] Dkt. 65-7. The Settlement Agreement was journalized in the foreclosure case in July of 2014. Dkt. 65-8.
[8] Dkt. 65-7, p. 2.
[9] Dkt. 65-7, p. 3. Emphasis added.
[10] *Id.*, pp. 3-4.

4

The parties acknowledged that Schaffer's judgment lien was senior in priority to the mortgage and judgment liens of the other creditors. Krier agreed that by November 1, 2014, he would either refinance all of his obligations to Schaffer and the other lienholders or sell his land and pay all of them in full. The Settlement Agreement would become part of a journal entry of judgment and if Krier failed to perform, all of the property he listed as collateral for his various debts would be sold at sheriff's sale on November 1, 2014 and the parties paid in priority order.

The Settlement Agreement contained an integration clause:

> Absolute, Complete Agreement. This agreement is absolute and irrevocable. It constitutes the complete and final expression of the parties' understandings concerning settlement and dismissal of the above captioned action [the foreclosure]. ***This agreement supersedes all previous contracts, agreements, and understandings of the parties, whether oral or written****. . . .* [11]

The Settlement Agreement was submitted to the state court for approval along with a Journal Entry of Judgment that all of the parties approved and that the court entered on July 18, 2014.[12] The Journal Entry finds that the notes of Guaranty Bank were in default and that, pursuant to the Settlement Agreement, Schaffer was owed $88,000. The Journal Entry further states that:

> Defendants, Constance Shaffer, Midway Co-op, Inc., and MNM Seeds, LLC ***all have valid judgments against the Defendant, Ronald L. Krier, in the amounts and priority referenced above***, which

---

[11] *Id*. at p.7. Emphasis added.
[12] Dkt. 65-8.

amounts include interest accrued and accruing through November 1, 2014.[13]

The Journal Entry barred the plaintiff and the judgment creditors from executing on those judgments until November 1, 2014 and provided for the plaintiff to arrange for a sheriff's sale at execution to be held on November 1, 2014 pursuant to an order of sale. The recitation in the Settlement Agreement concerning the nature of Krier's original obligation to Schaffer is the only reference to any part of the debt having been for spousal support.

Krier filed this chapter 12 case on October 27, 2014. Schaffer filed a proof of claim for $88,000 plus interest accruing at 4.75% per annum, describing the debt as a secured claim for "domestic support obligation/property settlement."[14] Krier's chapter 12 plan proposes to pay Schaffer $88,000 in annual payments, amortizing her $88,000 claim at the trustee's *Till* rate of 5.25% per annum over 20 years after confirmation.[15]

Schaffer objected to the plan on several grounds. She argues first that one-half of the $88,000 is domestic support that came due on November 1, 2014, post-petition, and must be paid in full to satisfy § 1225(a)(7). She also argues that the proposed 20 year term, at an interest rate lower than that being paid a subordinate secured

---

[13] Dkt. 65-8, p. 3, ¶ 4. Emphasis added.
[14] *See* Claim 13-1.
[15] Dkt. 19, p. 6. *See Till v. SCS Credit Corp.*, 541 U.S. 465, 479 (2004) (Discount rate for secured claims in chapter 13 equals prime rate plus a default risk factor).

6

creditor, Guaranty Bank, was not proposed in good faith, barring confirmation under § 1225(a)(3). Nor is the proposed repayment sufficient under § 1225(a)(5).[16]

Krier argues that the Settlement Agreement replaced the twin support and property claims with one debt and that the new debt is no longer a domestic support obligation that must be paid at confirmation. He argues that he is proceeding in good faith, that the *Till* rate is appropriate, and nothing in the Code prevents him from extending the repayment period for debt secured by a judgment lien for 20 years.

This case has been pending since October 27, 2014. Krier filed his plan on January 22, 2015. Schaffer's is the only objection remaining in controversy. At their request, Krier's and Schaffer's counsel submitted stipulations and briefs concerning Ms. Schaffer's objections to the plan. Those objections centered on the nature and treatment of her claim. On August 18, Krier appeared in court and testified in support of his plan, including its feasibility, but there have been no further proceedings in this case beyond Krier's and Schaffer's briefing of the issues surrounding her claim.

Analysis

The Settlement Agreement as adopted in the Journal Entry of Judgment acknowledges that Krier's original obligations to Schaffer were for spousal maintenance and property settlement, but goes on to state that the Agreement is intended to "establish certain amounts" for his debts and to "resolve all issues

---

[16] In her brief, Schaffer also argued that Krier's plan didn't provide for her to retain her lien as § 1225(a)(5)(B) requires, but that is incorrect. It does. *See* Dkt. 19, p.6.

7

pending before the parties in all cases set forth above, together with any other issues not heretofore stated or alleged ...."[17] It also states that Schaffer's $88,000 claim is a modification of a prior amount due and that payment of that amount will satisfy all of Krier's obligations to her.[18] Most notably, the Settlement Agreement states that it is the final expression of the understandings among the parties that "supersedes all previous contracts, agreements and understandings...."[19] The Journal Entry recites that Schaffer has a judgment for $88,000 that can be enforced by execution sale if Krier doesn't comply with the terms of the Settlement Agreement.[20]

These terms are different from those set out in the 2005 Agreement.[21] Then, Ms. Schaffer's claim was expressly bifurcated between property settlement and maintenance.[22] Though the payments on each were in equal amounts, the maintenance payments terminated upon Ms. Schaffer's death or remarriage and, if Krier missed any property settlement payments, interest would accrue on the unpaid principal balance. The final payments were not due until February of 2020. Compare this to the terms of the Settlement Agreement that combined and discounted the amount of the support and property debts, eliminated the periodic payment scheme entirely, omitted any mention of payments being terminated on remarriage or death,

---

[17] Dkt. 65-7, p. 3, ¶ 5.
[18] *Id.* at ¶ 4.
[19] *Id.* at p. 7, ¶ 2.
[20] Dkt. 65-8, p. 4, ¶s 8-9; Dkt. 65-7, p. 6, ¶ 5-6.
[21] Dkt. 65-2.
[22] *Id.* at pp. 2-3, ¶s 4-5.

8

and converted the obligation to a lump sum judgment payable no later than November 1, 2014.

The Settlement Agreement is a novation that replaced and extinguished the 2005 Agreement. A novation is "a new contractual relation" that is substituted for an old one, extinguishing the former agreement.[23] It replaces the previous agreement in its entirety rather than modifying only some of the prior agreement's terms and is different from an executory accord, an agreement that merely promises a substituted performance of an existing promise:

> The distinction between a novation and an executory accord becomes significant in the event of breach of the new agreement. If the new agreement constitutes a novation, a breach does not revive the discharged claim and the parties' rights are controlled by the new agreement. [citations omitted]
>
> On the other hand the effect of a breach of an executory accord is stated in the following: 'Since an accord executory operates at best no more than as a suspension of the antecedent claim, a material breach of the accord by the debtor lifts the suspension and makes the creditor's prior claim again enforceable.' [citation omitted].[24]

An executory accord allows the unmodified terms of the prior agreement to be revived. A novation doesn't. Whether the agreement is a novation or an executory accord is a matter of intent.[25] We can infer that the parties intended to replace the former contract with the latter one when the provisions of the latter contract differ

---

[23] *Elliott v. Whitney*, 215 Kan. 256, 259-260, 524 P.2d 699 (1974).
[24] *Id*. at 260.
[25] *Id*.

"radically" from the former.[26] So it is here. Not only did the Settlement Agreement dramatically modify both the payment scheme and the amount due under the 2005 Agreement, it dropped any mention of the debt being support or maintenance, as well as the termination on remarriage or death terms. Krier agreed to pay his discounted debt in a few weeks, not years. After they signed it, the Settlement Agreement replaced the 2005 Agreement between Krier and Schaffer.

Bankruptcy Code §101(14A) defines a "domestic support obligation" ("DSO") as a debt that is owed to a former spouse that is "in the nature of alimony, maintenance, or support," and has been established by a matrimonial agreement or a court order. After the recitals, nothing in the Settlement Agreement or Journal Entry suggests that Mr. Krier's restated debt to Ms. Schaffer is a DSO. In *In re Sampson*, the Tenth Circuit Court of Appeals announced a two-step analysis for bankruptcy courts to use in determining whether a matrimonial debt is in the nature of support and excepted from discharge.[27] *Sampson* gives some weight to how the issuing court describes the obligation, but also applies a series of factors that consider the comparative financial abilities of the two parties at the time of the divorce, the frequency and regularity of the periods between payments, the overall length of the payment term, whether the payments terminate upon a life event like the payee spouse's remarriage or death or the emancipation of a child, whether the obligation can be modified, how it is treated

---

[26] *Id.*
[27] 11 U.S.C. § 523(a)(5); *In re Sampson,* 997 F.2d 717, 722-23 (10th Cir. 1993) (dual inquiry into the parties' shared intent and the substance of the obligation).

10

for tax purposes, and the current circumstances of the parties.[28] The Settlement Agreement doesn't describe Krier's obligation to Schaffer as support. Nor are any of the *Sampson* considerations addressed. Accordingly, none of Schaffer's claim under the Settlement Agreement qualifies as a DSO and Krier need not pay her claim in full as a prerequisite to confirmation as § 1225(a)(7) would have required.[29]

But winning the DSO battle doesn't win Krier the war because he has not demonstrated that he proposed Schaffer's plan treatment in good faith under § 1225(a)(3) or that the treatment complies with the cram-down requirements of § 1225(a)(5). "Good faith" in this context is determined by considering the familiar "*Flygare*" factors.[30] The relevant factors here are the motivation and sincerity of the debtor, the timing of his filing, and his effort to repay Ms. Schaffer.[31] It is difficult to draw a positive impression of Krier's motivation and sincerity when he has been in payment default to Schaffer since 2005, has made NO payments since 2010, and when, after he bargained her debt down from $106,000 to $88,000 in May and

---

[28] *Sampson,* 997 F.2d at 723-26. *See also, In re Goin,* 808 F.2d 1391, 1392-93 (10th Cir. 1987).
[29] Though the parties spar over whether the obligations in the 2005 Agreement were DSO, the old agreement has been extinguished by the Settlement Agreement, mooting that issue.
[30] *See Flygare v. Boulden,* 709 F.2d 1344, 1347-48 (10th Cir. 1982) (adopting eleven non-exclusive factors enumerated in *In re Estus,* 695 F.2d 311, 317 (8th Cir. 1982)), *superseded by statue In re Cranmer,* 697 F.3d 1314, 1319 n. 5 (10th Cir. 2012) (BAPCPA's amendment in § 1325(b) subsumes some of *Flygare/Estus* "ability to pay" factors and narrows good faith inquiry; exclusion of social security income from calculation of projected disposable income calculation cannot constitute lack of good faith where Code expressly allows exclusion); *In re Sorrell,* 286 B.R. 798, 805 (Bankr. D. Utah 2002) (applying *Flygare* factors to determine whether chapter 12 plan is proposed in good faith, noting that good faith in chapter 12 is similar to chapter 13 case).
[31] *Flygare,* 709 F. 2d at 1348.

11

promised to pay her in full by November 1, 2014, he instead filed this case on October 27. Adding insult to injury, Krier proposed to pay Schaffer's discounted claim over a new 20 year period that will not end until 16 years after the original 2005 obligation would have been paid in full. And, though Schaffer holds a fully-secured first lien, he offered her a lower rate of interest than Guaranty Bank will receive.

Ms. Schaffer is not a bank and shouldn't be treated like one. She is the debtor's former wife whose ex-husband kept this land by agreeing to pay her for her share of it -- and hasn't. Not only does Krier's pre-petition conduct reflect poorly on his motivation and sincerity, but the timing of his filing, the proposed duration of his payments to Schaffer, and his previous efforts to repay reinforce my concluding that his treatment of her claim is not proposed in good faith.[32]

Even if Krier has proceeded in good faith, his treatment of Schaffer's claim doesn't comport with § 1225(a)(5). That section requires that Ms. Schaffer have accepted the plan or that she retain her lien and receive value in an amount not less than the value of her secured claim. While the plan proposes that Schaffer retain her lien, it also proposes that she will receive a lower rate of interest than Guaranty Bank despite her first lien status, and be repaid over the same 20-year term as all of the other creditors, all commercial entities in the business of extending credit. The debtor offers no justification for the differential in rates, though I am persuaded that the so-

---

[32] *See e.g. In re Melcher*, 416 B.R. 666, 669 (Bankr. D. Neb. 2009) (extension of alimony and property settlement judgment by 30 years "unfair and in bad faith").

12

called *Till* rate, the prime rate adjusted for risk, is appropriate.[33] In any case, the repayment period is too long. Bloomberg's *Bankruptcy Treatise* suggests that—

> While there is not a specific provision in the Code that governs the extent to which the repayment period of a secured claim may be extended, courts consider the economic life of the collateral, the age of the debtor, *the length of the underlying note, and the creditor's customary repayment periods for similar loans* when deciding whether a claim's treatment will stretch over too long a period.[34]

Even though Schaffer's collateral is real estate that might support extending a creditor's repayment term over a period of years, Krier's underlying obligation to her was to have been satisfied within a few months, not an additional 20 years. Extending payment of what was established as a 15 year debt in 2005 out to 2036 is an inequitable and unsuitable treatment of Schaffer's claim that I cannot confirm.[35]

Ms. Schaffer also objects that this plan is unfeasible.[36] There is nothing in the stipulations about that, though Mr. Krier has testified about feasibility in his proffer. Because I conclude that the plan cannot be confirmed, Ms. Schaffer's feasibility

---

[33] *See Till v. SCS Credit Corp.*, 541 U.S. 465, 479 (2004); *see also In re Woods*, 465 B.R. 196 (10th Cir. BAP 2012), *rev'd on other grounds* 743 F.3d 689 (10th Cir. 2014) (Similarity of chapter 12 to chapter 13 makes *Till* rate applicable in both).

[34] BLOOMBERG LAW: BANKRUPTCY TREATISE, pt. VI, ch. 212, at III.F.4.a. (D. Michael Lynn *et al.* eds, 2015), available at www.bloomberglaw.com/content/bankruptcytreatise. *See also In re Torelli*, 338 B.R. 390 (Bankr. E.D. Ark. 2006); *In re Koch*, 131 B.R. 128, 132-33 (Bankr. N.D. Iowa 1991); *In re Lupfer Bros.*, 120 B.R. 1002, 1005 (Bankr. W.D. Mo. 1990) (citing *In re Peterson*, 95 B.R. 663 (Bankr. W.D. Mo. 1988)); and *In re Foster*, 79 B.R. 906, 911 (Bankr. D. Mont. 1987).

[35] *In re Melcher*, 416 B.R. 666 (Bankr. D. Neb. 2009); *In re Kemp*, 134 B.R. 413 (Bankr. E.D. Cal. 1991) (10-year repayment of former wife not in good faith where debtor could pay more); and, *generally, In re Torelli,* 338 B.R. 390 (Bankr. E.D. Ark. 2006) (Reamortization of prior 10-year bank obligation to 20 years violated present value requirement of § 1225(a)(5)).

[36] 11 U.S.C. § 1225(a)(6).

13

objection is moot. If and when Mr. Krier offers an amended plan, I will consider reopening the record on whether that plan is feasible.

Conclusion

Because the plan's treatment of Ms. Schaffer's allowed secured claim was not proposed in good faith, and because that treatment does not satisfy the cram-down requirements of § 1225(a)(5) due to the excessively lengthy repayment period, confirmation is DENIED. If the debtor does not file an amended plan or convert this case to chapter 7 within 21 days of this order, the case will be DISMISSED without further notice.

###

14